# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 18-31304

United States Court of Appeals
Fifth Circuit

**FILED**
January 15, 2020

Lyle W. Cayce
Clerk

CLAIMANT ID 100245152,

> Requesting Party - Appellant

v.

BP EXPLORATION & PRODUCTION, INCORPORATED; BP AMERICA PRODUCTION COMPANY; BP, P.L.C.,

> Objecting Parties - Appellees

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:18-CV-10457

Before JOLLY, GRAVES, and HIGGINSON, Circuit Judges.

PER CURIAM:*

This is an appeal from a district court order denying discretionary review of a claim submitted to the BP Settlement Program. We reverse and remand.

## I. BACKGROUND

Following the Deepwater Horizon oil spill in 2010, BP negotiated and agreed to a settlement agreement (the "Settlement Agreement") with a

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

proposed class of individuals and entities. The Settlement Agreement created a system (the "Settlement Program") through which class members can submit claims and receive payment for those claims that are approved. USA Hosts, Ltd. ("USA Hosts"), the claimant in this case, disputes the Settlement Program's application of the Settlement Agreement to its claim.

## A. Relevant Provisions of the Settlement Agreement

Under the Settlement Agreement, there are two frameworks for calculating the available compensation: the business economic loss ("BEL") framework and the failed business economic loss ("FBEL") framework. *See, e.g.*, *Claimant ID 100081155 v. BP Expl. & Prod., Inc.*, 920 F.3d 925, 927 (5th Cir. 2019). The FBEL framework is at issue here. That framework applies to "failed businesses," a term which has a substantially broader meaning under the provisions of the Settlement Agreement than it does in colloquial use. Specifically, Exhibit 6 to the Settlement Agreement defines a "failed business" as a business entity that

> commenced operations prior to November 1, 2008 and that, subsequent to May 1, 2010 but prior to December 31, 2011, either (i) ceased operations and wound down, or (ii) entered bankruptcy (through the filing of a petition for bankruptcy protection in a court of competent jurisdiction), or (iii) otherwise initiated or completed a liquidation of substantially all of its assets.

Policy 506, which was adopted to construe and implement Exhibit 6, "interprets the definition" of a failed business to include any entity that

> initiated or completed a liquidation of substantially all of its assets, irrespective of whether or not the sale was initiated in connection with a formal bankruptcy proceeding administered by the Court, a foreclosure situation, short sale or deed in lieu of foreclosure. A voluntary sale of a business, or substantially all of the assets of an Entity, that occurred after May 1, 2010 but before

2

No. 18-31304

December 31, 2011 would cause such Entity to be considered a Failed Business or Failed Start-Up Business.[1]

The FBEL framework uses a business's past earnings to calculate compensation, which it does by subtracting the value the entity or its owner realized from the business between the spill and the time the business discontinued (the "liquidation value") from the estimated pre-spill value of the business (the "total enterprise value"). If that calculation results in a negative value, a claimant is not entitled to compensation through the settlement agreement.

Exhibit 6 to the Settlement Agreement provides that the base liquidation value of a failed business should be calculated based on what we refer to as either the "bankruptcy compensation methodology" or the "sales proceeds compensation methodology." Under the bankruptcy compensation methodology, the starting point for determining an entity's liquidation value is "the court-approved reorganization value, to the extent [the business was] reorganized under [the] bankruptcy law process." Under the sales proceeds compensation methodology, the starting point for determining an entity's liquidation value is the "sales proceeds from assets liquidated plus [the] certified appraisal values of assets yet to be liquidated under a plan of liquidation, net of actual or anticipated liquidation costs . . . as relevant." Whether calculated using the bankruptcy compensation methodology or the sales proceeds compensation methodology, the total liquidation value is then increased to reflect

> any creditor claims existing [pre-spill] and discharged during bankruptcy, and any amounts received by the claimant from BP or the [Gulf Coast Claims Facility ("GCCF")] pursuant to BP's [Oil

---

[1] A second version of Policy 506 (Policy 506 v.2) is currently in use. For brevity, we refer to the policy simply as "Policy 506."

Pollution Act] claims process, or profits earned by the claimant by participating in any BP-sponsored spill remediation program . . . .

Policy 506 makes clear that "creditor claims existing [pre-spill] and discharged during bankruptcy" include any "long term interest bearing debt that has been forgiven by a lender, as well as distributions to owners/shareholders" made after the spill. Payments made to owners and/or shareholders can be made in forms "that may include, but are not limited to[,] capital withdrawals, owner's compensation, dividend payments[,] or the forgiveness of an owner's loan." Conversely, if creditor claims increased after the spill—including increases in amounts due to an owner and/or shareholder—the liquidation value is reduced accordingly.

After a claimant submits a claim, the Claims Administrator determines whether that claimant is an ongoing or failed business and how much compensation is due. The claimant may request reconsideration of those decisions. Either BP or the claimant may appeal a final decision of the Claims Administrator to a Settlement Program appeal panel (an "Appeal Panel"), and the district court retains discretion to review the Settlement Program's determinations to ensure that the Claims Administrator and the Appeal Panel correctly interpreted and applied the Settlement Agreement. *See Claimant ID 100081155*, 920 F.3d at 927.

### B. USA Hosts' Claim and Appeal

USA Hosts is a Nevada corporation engaged in "destination management." It designs and implements "events, activities, tours, transportation, and program logistics in a particular geographic area." At the time of the oil spill, USA Hosts had locations in Dallas, Hawaii, Las Vegas, New Orleans, and Washington, D.C.

In January 2011, USA Hosts sold the New Orleans branch of its operations as part of a sale that also included the company's Las Vegas and

No. 18-31304

Washington, D.C. facilities. All three facilities were sold for a lump-sum purchase price of $1,000,000, which was broken down by category of asset but not by location. USA Hosts submitted a business economic loss claim solely on behalf of its New Orleans location. Because the New Orleans location was sold between May 1, 2010 and December 31, 2011, the Claims Administrator classified the claim as one for a failed business economic loss.

USA Hosts received several eligibility notices regarding its compensation determination. The first two, which both used the sales proceeds compensation methodology, incorrectly attributed the entire price of the January 2011 sale to the New Orleans location. They therefore determined that USA Hosts was entitled to negative $310,319.63 in compensation and should receive a zero-dollar award. USA Hosts filed requests for review and reconsideration, resulting in a third eligibility notice. That notice also used the sales proceeds compensation methodology and again resulted in a zero-dollar award. (It calculated the compensation amount as negative $12,812.62.) But as USA Hosts pointed out to the Appeals Panel, the Claims Administrator made a mistake when calculating revenue. The Appeals Panel thus remanded the claim for recalculation.

On remand, the Claims Administrator for the first time used a different methodology. Instead of using the sales proceeds compensation methodology, as had been used in the prior three eligibility notices, the fourth notice applied the bankruptcy compensation methodology. Specifically, it used forgiven debts and shareholder payments to increase the liquidated value calculation. This final eligibility notice also resulted in a zero-dollar award, though it calculated the compensation amount due to USA Hosts as negative $7,367.41.

USA Hosts objected to the use of the bankruptcy compensation methodology and filed a request for reconsideration and an administrative

appeal. Both were unsuccessful. The district court denied discretionary review, and USA Hosts appealed to this court.

## II. STANDARD OF REVIEW

When the district court refuses to exercise its discretion under the Settlement Program to review an Appeal Panel decision, this court reviews that refusal for abuse of discretion. *Holmes Motors, Inc. v. BP Expl. & Prod., Inc.*, 829 F.3d 313, 315 (5th Cir. 2016). A declination may be an abuse of discretion in two situations. *BP Expl. & Prod., Inc. v. Claimant ID 100317640*, 766 F. App'x 112, 115 (5th Cir. 2019) (per curiam) (unpublished). One is when the panel decision "actually contradicted or misapplied the Settlement Agreement, or had the clear potential to contradict or misapply the Settlement Agreement." *Holmes Motors*, 829 F.3d at 315 (5th Cir. 2016) (quoting *In re Deepwater Horizon*, 641 F. App'x 405, 409–10 (5th Cir. 2016)). The other is when the decision "raises a recurring issue on which the Appeal Panels are split" and "the resolution of the question will substantially impact the administration of the Agreement." *Claimant ID 100212278 v. BP Expl. & Prod., Inc.*, 848 F.3d 407, 410 (5th Cir. 2017) (quoting *In re Deepwater Horizon*, 632 F. App'x 199, 203–04 (5th Cir. 2015)).[2]

## III. DISCUSSION

We agree with USA Hosts that the district court abused its discretion in denying discretionary review of the claim at issue.

Multiple Appeal Panel decisions have addressed the same issue. Those panels found, in contrast to the Appeal Panel here, that pre-spill debts discharged during bankruptcy—and Policy 506's interpretation of that phrase

---

[2] "The interpretation of a settlement agreement is a question of contract law that this Court reviews de novo." *In re Deepwater Horizon*, 785 F.3d 1003, 1011 (5th Cir. 2015). But here, reviewing the district court's denial of discretionary review merely requires evaluating whether the Appeals Panels are split on an issue that could substantially impact the administration of the Settlement Agreement.

to include forgiven debts and shareholder payments—do not apply to non-bankrupt failed businesses. *See* Appeal Panel Decision ("APD") 2018-1178 (remanding to the Claims Administrator for recalculation because the Settlement Program "erred in increasing the total liquidation value by the different, non-bankruptcy discharged, items it added in"); APD 2017-3203 (noting that "[t]he company never filed for bankruptcy" and finding that "the calculations should be run without consideration of creditor claims existing pre-spill" that were subsequently discharged).

BP argues that none of those Appeal Panel decisions "involved the specific issue that the Claims Administrator was faced with here." But BP's characterization of that issue—administration of "failed business claims involving the sale of a location in the Gulf Coast area, as part of a bundle with other operations outside the Gulf Coast, for an undifferentiated lump sum"—is excessively narrow. The question raised by USA Hosts, and confronted by the Claims Administrator in the examples cited above, is whether or not pre-spill debts discharged during bankruptcy can be used to increase a failed business's liquidation value even when the business did not go bankrupt.

"Different facts leading to different outcomes do not create a split." *BP Exp. & Prod., Inc. v. Claimant ID 100237661*, 766 F. App'x 161, 164 (5th Cir. 2019) (unpublished). But the Appeals Panel decisions identified by USA Hosts have shared factual backgrounds in at least one important sense: they involve failed business claimants that did not go through bankruptcy but whose balance sheets reflected forgiven debts and shareholder payments within the meaning of the Settlement Program. Appeal Panel decision 2018-1178 makes that commonality clear: it notes that "three previous Appeal Panel decision[s] . . . held that the [Settlement Program's] increases to total liquidation value in the form of items of the type at issue here, where the claimant never filed bankruptcy, exceeded the bounds of Exhibit 6." APD 2018-1178.

It is not an abuse of discretion to deny a request for review that "simply raise[s] the correctness of a discretionary administrative decision in the facts of a single claimant's case." *Claimant ID 100212278*, 848 F.3d at 410. But the Settlement Program's alleged violation of Exhibit 6 is recurring. A recent Appeal Panel decision quotes, in full, the Account Compensation Calculation Schedule used by the Settlement Program "for all claims involving [f]ailed [b]usinesses." APD 2019-16. That schedule directs all claims administrators—in contravention of the Appeal Panel decisions quoted above—to add creditor claims that existed prior to the spill and were "[d]ischarged [s]ubsequently" to the liquidation value of an entity's assets, regardless of whether or not that entity went through bankruptcy. A split on this issue would certainly "substantially impact the administration of the Agreement." *In re Deepwater Horizon*, 632 F. App'x at 203–04. We therefore find that the district court abused its discretion by declining to review the Appeal Panel decision in this case.

## IV. CONCLUSION

We REVERSE the district court's opinion refusing discretionary review and REMAND this case for further proceedings.